In re Paul Thomas DEMOS,
II, Petitioner.

No. 84–1777.

District of Columbia Court of Appeals.

Argued Feb. 25, 1988.
Decided May 26, 1989.

Paul T. Demos, II, pro se.

Lloyd N. Moore, Jr., for respondent, Committee on Admissions.

Before NEWMAN, BELSON,* and TERRY, Associate Judges.

PER CURIAM:

Paul Thomas Demos, II, is an applicant for admission to the District of Columbia Bar, having passed the written bar examination administered in February 1983. Following two formal hearings, the Committee on Admissions declined to certify his admission, concluding that there remained "substantial doubts about the applicant's honesty, fairness, and respect for the rights of others." Having reviewed the record that was before the Committee on Admissions, considered the briefs, and heard oral argument, we order that he be admitted to the bar.

Mr. Demos' difficulty in gaining admission to the District of Columbia Bar results mainly from certain incidents which oc-

---

* Associate Judge Mack was a member of the division of the court that heard oral argument. She subsequently recused herself from the case, and Judge Belson was chosen by lot to replace her.

curred a few years ago in Texas. On March 6, 1985, Mr. Demos was found guilty of assault after a trial in a Texas court. Apparently for his expression of displeasure with the verdict, the court also found Mr. Demos guilty of contempt. In addition, the Texas Bar forwarded to our Committee on Admissions certain materials relating to an investigation of Mr. Demos for the unauthorized practice of law.

At a formal hearing in September 1987, Mr. Demos presented his own testimony and that of his father, an attorney, concerning these matters. Mr. Demos explained that his conviction of assault had been reversed because of the trial court's erroneous denial of his motion for a change of venue. As to the contempt conviction, he testified that he had in fact shown anger and displeasure over his conviction of assault, but that the contempt conviction was unwarranted. He asserted that he had great respect for the judicial system. Finally, Mr. Demos characterized the complaints filed against him for the alleged unauthorized practice of law as groundless and without merit. He also pointed out that no charges were ever brought against him as a result of that investigation.

Nevertheless, the Committee was not convinced of Mr. Demos' good moral character. It stated in its second supplemental report to this court:

> The Committee remains of the opinion that the entry of a judgment of contempt against Mr. Demos is evidence of the applicant's lack of respect for the judiciary and reflects poorly upon his competence to comport himself in the manner expected of a member of the District of Columbia Bar.... This case is distinguishable from [In re Manville, 538 A.2d 1128 (D.C.1988) (en banc) (Manville II )], in which the court saw fit to admit individuals who had been convicted of serious felonies. In [Manville II ] a considerable period of time had passed since the applicants' criminal behavior, there was substantial evidence of rehabilitation, and there was ample evidence of remorse on the part of the applicants.

These indicia are lacking in Mr. Demos' case. His conviction occurred within the last few years; he has shown little evidence of remorse and has presented no evidence to the Committee of any rehabilitative efforts on his part.

 To state the obvious, "[i]t is, ultimately, for this court to decide whether an applicant shall be admitted to the bar of the District of Columbia." In re Manville, 494 A.2d 1289, 1292 (D.C.1985) (footnote omitted) (Manville I ). This court has created the Committee on Admissions in the exercise of its statutory authority to regulate the admission of persons to membership in its bar.[1] When the Committee makes a recommendation with respect to an applicant, this court generally accepts the Committee's findings of fact unless they are unsupported by substantial evidence of record. We also "afford the Committee's recommendations some deference, since the Committee has been constituted as an arm of this court to deal regularly with issues concerning admissions to the bar and exists for the express purpose of making recommendations to the court. Nevertheless, the ultimate decision regarding admission or denial of admission remains for this court to make." Manville I, supra, 494 A.2d at 1293.

 We note at the outset—and indeed it is undisputed—that Mr. Demos' conviction of assault has been reversed and that no charge of unauthorized practice of law has ever been brought against him. Thus the only fact suggesting that he lacks good moral character is his conviction of contempt. In light of our decisions in Manville I and Manville II, supra, we do not think this is a sufficient ground for denying him admission to the bar. In Manville I the applicant had been convicted of voluntary manslaughter almost ten years before applying for admission and taking the bar examination. The Committee on Admissions was evenly divided on whether to recommend his admission. When the matter came before this court thereafter, see D.C.App.R. 46(f)(4), we rejected the no-

---

1. D.C.Code § 11–2501(a) (1981); see D.C.App.R. 46(a).

tion that a prior felony conviction *per se* requires denial of an application for admission. We emphasized that it is present, not past, moral fitness which is at issue and that, at most, a past felony conviction imposes on an applicant an " 'added weight of proving his full and complete rehabilitation subsequent to the conviction.' " *Id.* at 1295–1296, quoting from *In re Davis*, 38 Ohio St.2d 273, 274, 313 N.E.2d 363, 364 (1974).

■ The "added weight" of proof which an applicant must bear depends on the nature of the prior conviction. It is self-evident that a murder conviction will create greater doubts as to one's moral fitness to practice law than a conviction of contempt of court. "The more serious the misconduct, the greater the showing of rehabilitation that will be required." *In re Matthews*, 94 N.J. 59, 81, 462 A.2d 165, 176 (1983) (citation omitted). In this case Mr. Demos not only affirmed his respect for the judicial system but also presented several affidavits testifying to his moral character. We conclude that he carried his burden of proving his moral fitness, notwithstanding whatever slight weight might have been added to that burden as a result of his contempt conviction.

■ The Committee has pointed to Mr. Demos' lack of remorse concerning the incident that led to the finding of contempt, noting that the three applicants in *Manville II* had offered "ample evidence of remorse." It is true that we said in *Manville I* that when questions of moral fitness arise as a result of a criminal conviction, "[e]vidence of the applicant's reform and rehabilitation must also be taken into account." 494 A.2d at 1295 (footnote omitted). Remorse is certainly symptomatic of reform and rehabilitation. But here the questions as to moral fitness arising as a result of Mr. Demos' conviction of con-

tempt, given the factual circumstances of that conviction, are so slight as not to require evidence of reform, rehabilitation, or remorse. Mr. Demos has argued that his conviction of contempt was unwarranted. We see no reason to expect or demand remorse of one who believes he has been wrongfully convicted. Respect for the judicial system does not require respect for what one perceives as an injustice.

In any event, we are fully satisfied that Mr. Demos has demonstrated the requisite moral character to practice law. Accordingly, we direct that Paul Thomas Demos, II, be admitted to the bar of the District of Columbia upon taking the oath prescribed by Rule 46(h) of the General Rules of this court.

*It is so ordered.*

BELSON, Associate Judge, dissenting:

The Committee on Admissions has recommended unanimously that the application of Paul T. Demos II for admission to the Bar of the District of Columbia be denied, and has twice reiterated that recommendation after further proceedings. The Committee found that Mr. Demos failed to demonstrate his good moral character and fitness to practice law. I dissent from the majority's decision to admit Demos because I agree with the Committee's reasons for recommending denial of admission, some of which the majority opinion, in my view, does not address sufficiently.

Demos' efforts to gain admission to the Bar of the District of Columbia began after he received a J.D. degree from the Potomac School of Law in 1982. He initially received less than a passing score in both the July 1982 and the February 1983 District of Columbia Bar examinations. He petitioned, however, for a regrading of the February 1983 examination, and received a passing score.[1]

---

1. The rules then in effect for the District of Columbia Bar examination designated a grade of 70.00 as a passing score. The rules also provided that all scores were to be rounded. While Demos failed the July 1982 exam, he received a score of 69.95 on the February 1983 exam. Although Demos was initially refused admission based on his performance on the

February 1983 written exam, the Committee eventually granted Demos' petition to have his score rounded to 70.00, a passing grade, as provided by the rules. The Committee, however, subsequently declined to admit Demos based on his failure to demonstrate his moral fitness.

In the first of its unanimous recommendations against Demos' admission, the Committee dealt with behavior by Demos in the state of New Mexico which is not mentioned in the majority opinion. While working as a law clerk in the office of his father, a member of the New Mexico Bar (among others), Demos participated as an attorney in the deposition of a witness in a workers' compensation action. His irregular participation in that deposition while not admitted to practice resulted in a hearing before the Honorable Michael Martinez, a New Mexico state trial judge. In the course of the hearing before Judge Martinez, Demos represented that he had already passed the D.C. Bar, even though he was still awaiting formal action on his petition for the upgrading of his score of 69.95 to a passing grade. Demos also represented that he had graduated from Antioch Law School when instead, while he had attended Antioch for his first two years of law school, he subsequently enrolled and graduated from the Potomac School of Law. Judge Martinez eventually held Demos in contempt of court because of his participation in the deposition. The court, however, permitted Demos to purge the contempt by paying the expenses of the opposing party.

In its original consideration of this matter, the Committee on Admissions addressed certain misrepresentations contained in Demos' response to the supplemental questionnaire sent to successful takers of the D.C. Bar Examination. Demos' answers failed to disclose that he had been held in contempt by Judge Martinez, although the form clearly called for revelation of that action. Demos presented evidence, which the Committee accepted, that the form had been filled out in his behalf by a friend while Demos was absent on vacation. The Committee did not view Demos' response to the supplemental questionnaire as a deliberate effort to conceal information, but rather as failure to exercise due care in the handling of his affairs. It concluded that its submission did "not rise to the level of dishonesty or a lack of good moral character."

The Committee did find, however, that the evidence supported a finding that Demos had engaged in the unauthorized practice of law in the State of New Mexico.[2] The Committee recognized, however, that the applicant's father and another attorney in that office shared much of the blame for Demos' unauthorized practice of law. It also found that "applicant was not honest and forthright in his testimony at the hearing before Judge Martinez, as well as before the Committee at [its] formal hearing."[3] The Committee went on to conclude that Demos had deliberately attempted to mislead the New Mexico court and that the record as a whole "shows that he exhibited a callous disregard for the truth while under oath." Committee on Admissions Findings and Conclusions on Moral Character and Fitness to Practice, December 18, 1984, at 6.

While Demos' application for admission and the report of the Admissions Committee were pending before this court, the Committee received information from the Character and Fitness Division of the Board of Law Examiners of the Supreme Court of Texas regarding (1) another judgment of contempt against Demos that was issued March 6, 1985, by the County Court

---

**2.** No New Mexico authority entered such a finding.

**3.** During his contempt hearing before Judge Martinez, Demos was evasive in answering questions about the signatures on several documents filed with the court. He was unwilling to identify certain signatures as his own or those of his father, for whom he was working at the time. Subsequently, at a hearing before the Committee on Admissions, Demos admitted he was vague in his answers to the New Mexico court. He also admitted to signing the documents in question and claimed that fear, and a desire to protect his father, prompted his equivocal answers in New Mexico. Demos has suggested that the hearing before Judge Martinez was irregular in that it should have been held before a different judge, and that he did not have adequate time to prepare for it. Before the Committee, Demos first answered, under oath, that he had misinformed the New Mexico court that he was a graduate of Antioch Law School because he had spent less than six months at the Potomac School of Law. Later at the same hearing, he acknowledged that he had attended the Potomac School of Law for a year.

of Rockwall County, Texas, (2) a conviction for assault entered against Demos on that same date by that court, and (3) an investigation by the State Bar of Texas into possible unauthorized practice of law by Demos.[4] These matters are addressed in the majority opinion. This court authorized the Committee on Admissions to supplement its record regarding Demos in view of the additional information from Texas. A further formal hearing was scheduled, but Demos failed to appear. The Committee thereafter issued a Supplemental Report and Recommendation, signed for the Committee by its Chair, which expressed, without dissent, its continued unwillingness to certify Demos' admission.

Subsequently, Demos informed the Committee that he had not received notice of the second formal hearing and, accordingly, the Committee scheduled a third formal hearing. Demos appeared and offered evidence at that hearing. Thereafter, in its Second Supplemental Report and Recommendation, the Committee evaluated Demos' explanation of the matters that had arisen in Texas, and then reevaluated his application in the light of pertinent case law and the rules of this court. The Committee recommended, once again without dissent, that the court deny admission to Demos.

In its discussion, the Committee indicated that it remained of the opinion that the entry of the Texas judgment of contempt against Demos "is evidence of the applicant's lack of respect for the judiciary and reflects poorly upon his competence to comport himself in the manner expected of a member of the District of Columbia Bar." Second Supplemental Report, May 23, 1988, at page 6. The Committee also expressed its grave concern about statements in his brief which, in the Committee's view, indicated his lack of respect for the judiciary. The Committee was referring to the following passage in Demos' supplemental brief in support of his application for admission:

> Furthermore, the Applicant is in agreement with the Committee's statement that "his actions shows (sic) his lack of respect for the Rockwall County judiciary[."]
>
> The Applicant cannot respect a judiciary system set on political favors, a system in which the judge has no legal qualifications, of one that uses the law for their own personal gain, and on (sic) which attempts to intimidate and humiliate those who are willing to speak the truth.
>
> The Applicant further states that he cannot respect such a system anymore tha[n] he can respect a government that defies its own laws and constitution by supplying arms and money to the rebels of Nicaragua, by maintaining secret bank accounts, and justifies its deception by decaring (sic) that they cannot remember.
>
> The Applicant further states that he cannot have respect for any institution that is undeserving of its respect. The Applicant states that for this he does not need to apoligize (sic).

Applicant's supplemental brief at 10. The Committee observed that "Mr. Demos' ex-

---

4. The State Bar of Texas reached no conclusion regarding the allegation of unauthorized practice in that state, nor did the Admissions Committee. The Committee did, however, question the judgment exercised by Mr. Demos in the situation involved. *See* discussion of Second Supplemental Report, *infra* p. 18. The Texas investigation was prompted by a grievance filed by one of Demos' former clients, Ms. Karolyn Craft. According to Ms. Craft, Demos represented her in a bankruptcy action. In a deposition taken by the Character and Fitness Division of the Board of Law Examiners of the Supreme Court of Texas, she testified that Demos' conduct led her to believe that he was an attorney. She also accused Demos of misappropriating her television set and V.C.R. for his own personal use. According to Ms. Craft, the management of her former apartment building had confiscated the property when she was unable to pay her rent. When she attempted to retrieve the property, she testified, Demos told her it was "gone." Ms. Craft went to the management office that same day and learned that Demos had retrieved the property almost two weeks earlier. She later found the V.C.R. in Demos' office and her T.V. in the living room of one of Demos' friends. In response to these accusations, Demos asserted that Ms. Craft's testimony is untrustworthy because of her prior credit problems and observed that the "property in question was a five year old television and VCR, with a value of less than $200.00." Supplemental Brief for the Applicant at 17.

planation that these statements were made in anger and are not indicative of his true respect for the judicial system ... did little to quiet the Committee's concerns." Committee on Admissions Second Supplemental Report and Recommendation of May 23, 1988, at 6.

The Committee went on to distinguish Demos' case from our recent decisions on the applications of Manville, Strauss, and Brooks, *see In Re Manville (Manville II)*, 538 A.2d 1128 (D.C.1988). Remarking that in those instances, this court saw fit to admit individuals who had been convicted of serious felonies, the Committee observed:

> In those cases, a considerable period of time had passed since the applicants' criminal behavior, there was substantial evidence of rehabilitation and there was ample evidence of remorse on the part of the applicants. These indicia are lacking in Mr. Demos' case. His conviction occurred within the last few years, he has shown little evidence of remorse and has presented no evidence to the Committee of any rehabilitative efforts on his part.

Committee on Admissions Second Supplemental Report and Recommendation of May 23, 1988, at page 6. The Committee then alluded to Demos' earlier behavior in New Mexico, and concluded that it remained unwilling to certify his admission to this court.

This statement of the proceedings that led to the unanimous recommendations of the Committee on Admissions lays the necessary groundwork for my explanation of the reasons I disagree with the decision to admit Demos to our bar. Some of them relate to matters not addressed in the majority opinion. Among those are the events in the State of New Mexico which cast serious doubt upon the applicant's character. These include his being held in contempt by Judge Martinez, his lack of candor before the New Mexico court as found by the Committee, and his unauthorized practice of law in the State of New Mexico

as found by the Committee. There is also the observation of the Committee that it was convinced that the applicant had not been honest and forthright in his testimony before the Committee at its formal hearing. Report of December 18, 1984, at page 6. In addition, there is the matter of the Committee's opportunity to hear the lengthy testimony of the applicant and to observe him firsthand as he answered a multitude of questions about his past behavior. As we said in *Manville I,*

> we accept findings of fact made by the Committee unless they are unsupported by substantial evidence of record. *See In re Heller*, 333 A.2d 401, 402 (D.C.) (per curiam), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975). *We also make due allowance for the Committee's opportunity to observe and evaluate the demeanor of the applicant where relevant, e.g., with regard to such attitudes as sincerity or remorse.* Finally, we afford the Committee's recommendations some deference, since the Committee has been constituted as an arm of this court to deal regularly with issues concerning admissions to the bar and exists for the express purpose of making recommendations to the court. Nevertheless, the ultimate decision regarding admission or denial of admission remains for this court to make.

*In re Manville*, 494 A.2d 1289, 1293 (D.C. 1985) (emphasis added). While the members of the majority had some opportunity to observe Demos firsthand at oral argument on appeal, the opportunity was not nearly so extensive as that afforded members of the Committee.[5]

I turn now to an important aspect of Demos' record with which the majority opinion deals, I believe, incorrectly, *i.e.*, the holding by the County Court of Rockwall County in Texas that Demos was in contempt of court. In that regard, the majority states "in light of our decisions in *Manville I* and *Manville II, supra,* we do not think that this is a sufficient ground for denying him admission to the bar." Major-

---

5. The dissenting judge was selected after oral argument to replace a member of the original

division who had recused herself.

ity opinion at 1148. The majority goes on to point out that Manville "had been convicted of voluntary manslaughter almost ten years before applying for admission and taking the bar examination." Majority opinion at 1148. It then states that the Committee on Admissions was evenly divided on whether to recommend his admission; that when the matter came before the court thereafter in *Manville I,* we rejected the notion that a prior felony conviction *per se* requires denial of an application for admission; and that "[w]e emphasized that it is present, not past, moral fitness which is at issue and that, *at most,* a past felony conviction imposes on an applicant an 'added weight of proving his full and complete rehabilitation subsequent to the conviction.' " Majority opinion at 1149 (emphasis added).[6] For the sake of completeness, I will add somewhat to this account of the handling of Manville's application by the Committee on Admissions and this court.

It is true, as the majority points out, that when Manville's application first came before this court in *Manville I,* the Committee on Admissions was evenly divided on whether to recommend his admission. It should be pointed out also, however, that after this court in *Manville I* remanded the application to the Committee with a direction for a more thorough investigation of Manville's background, the Committee on Admissions recommended Manville's admission to the bar by a vote of six to one. In our subsequent opinion in *Manville II,* the en banc court approved Manville's application for admission by a vote of six to two, and "reaffirm[ed] en banc the principles enunciated in *Manville I.*" 538 A.2d 1128, 1132 (D.C.1988).

In applying *Manville*'s holding to the application at bar, the majority here states that "it is self-evident that a murder convic-

tion will create greater doubts as to one's moral fitness to practice law than a conviction of contempt of court."[7] Majority opinion at 1149. The majority goes on to state its conclusion that Demos "carried his burden of proving his moral fitness, notwithstanding whatever slight weight might have been added to that burden as a result of his contempt conviction. Majority opinion at 1149.

It should be emphasized that in evaluating the application of a person who has a criminal conviction in his background, there is much more involved than simply weighing the seriousness of that conviction alongside the offenses committed by Manville, Brooks, and Strauss, and then assigning the applicant's conviction a weight commensurate with its relative seriousness. Accordingly, our en banc opinion in *Manville II* is not a signal that henceforth it will be relatively easy for persons who have committed offenses less heinous than manslaughter, armed robbery, or illegal drug transactions to become members of the District of Columbia Bar. The Committee's analysis of the instant application explains why it is not.

In comparing the instant application to the three applications involved in *Manville II,* the Committee on Admissions appropriately recognized that in *Manville,* "a considerable period of time had passed since the applicants' criminal behavior, there was substantial evidence of rehabilitation, and there was ample evidence of remorse on the part of the applicants." Indeed, in the case of Manville himself, we emphasized in our en banc opinion that he had "demonstrated a remarkable and thorough rehabilitation" in the fourteen years following his conviction of a felony. *Manville II, supra,* 538 A.2d at 1134. In *Manville I,* we set forth a list of eleven factors, not meant to be exhaustive but rather illustrative, that

---

6. Our remand in *Manville I* plainly imposed on one with a prior criminal conviction the "added weight of proving his full and complete rehabilitation," *Manville I, supra* 494 A.2d at 1295–96 (quoting from *In re Davis,* 38 Ohio St.2d 273, 274, 313 N.E.2d 363, 364 (1974)), but I am unable to find in our language in *Manville I* the basis for the majority's statement that "at most" a past felony conviction imposes such a burden.

Majority opinion at 1149. Our expression that such a burden was imposed was not qualified in that manner.

7. The majority, I should note, is not characterizing the Manville conviction as a murder conviction, but is using murder as an example of a very serious crime.

the courts could use to assess the moral fitness of applicants whose backgrounds were marked by criminal convictions.[8] After referring to our holding in *Manville I,* the Committee observed that Demos' conviction had occurred within the last few years, that he had shown little evidence of remorse, and no rehabilitative efforts.[9] The majority rejects this basis for the Committee's recommendation, stating:

> [H]ere the questions as to moral fitness arising as a result of Mr. Demos' conviction of contempt, given the factual circumstances of that conviction, are so slight as not to require evidence of reform, rehabilitation, or remorse. Mr. Demos has argued that his conviction of contempt was unwarranted. We see no reason to expect or demand remorse of one who believes he has been wrongfully convicted. Respect for the judicial system does not require respect for what one perceives as an injustice.

Majority opinion at 1149.

I cannot agree with the suggestion that where an applicant to the bar contends that he has been wrongfully convicted, as Demos contends he was, it is inappropriate to give any weight to his lack of remorse in considering his application for admission. I think that an unreversed conviction by a court of law should not be disregarded merely because the convicted person disagrees with his conviction.

Notwithstanding the majority's belief that a contempt citation raises only minor questions about Mr. Demos' fitness and good moral character, its reasoning is also questionable because it fails to consider all the other allegations against Mr. Demos. As we noted in *Manville I,* 494 A.2d 1289, 1295 (D.C.1985), "courts tend to consider the facts of each case in light of the totality of the circumstances surrounding an application for bar admission." It is appropriate here to consider all the evidence before the Committee.

Demos' actions suggest not only that he lacks respect for the judiciary, but also that he is unwilling to acknowledge that any of his actions amounted to misconduct. It is understandable that the Committee found it questionable whether Demos is capable of discharging the responsibilities of the legal profession in an acceptable fashion. As the Committee pointed out, "[g]iven the applicant's earlier problems regarding the unauthorized practice of law in the State of New Mexico, the Committee fails to understand how Mr. Demos could permit even the appearance of a similar situation to arise in regarding his activities in the State of Texas." Second Supplemental Report of May 23, 1988 at 6–7.[10] His conduct overall leads one to question whether Mr. Demos possesses "those qualities of truth-speaking, of a high sense of honor, or granite discretion, of the strictest observance of fiduciary responsibility, that have ... been ... described ... as [the] 'moral character' " necessary for the practice of law. *Schware v. Board of Bar Examiners,* 353 U.S. 232, 247, 77 S.Ct. 752, 760, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring).

---

8. We identified the following factors:
 1. The nature and character of the offenses committed.
 2. The number and duration of offenses.
 3. The age and maturity of the applicant when the offenses were committed.
 4. The social and historical context in which the offenses were committed.
 5. The sufficiency of the punishment undergone and restitution made in connection with the offenses.
 6. The grant or denial of a pardon for offenses committed.
 7. The number of years that have elapsed since the last offense was committed, and the presence or absence of misconduct during that period.
 8. The applicant's current attitude about the prior offenses (*e.g.,* acceptance of responsibility for and renunciation of past wrongdoing, and remorse).
 9. The applicant's candor, sincerity and full disclosure in the filings and proceedings on character and fitness.
 10. The applicant's constructive activities and accomplishments subsequent to the criminal convictions.
 11. The opinions of character witnesses about the applicant's moral fitness.
 *In re Manville,* 494 A.2d 1289, 1297 (1985).

9. In his brief, Demos asserts that since the contempt holding he has owned his own business and has been involved in local elections and community service.

10. See n. 4, *supra,* regarding the events in Texas.

Although it is apparent that Mr. Demos would not have to carry as heavy a burden as the applicants in *Manville II*, 538 A.2d 1128 (D.C.1988), it is still incumbent upon him to demonstrate his good moral character. Prior felony convictions are not the only sorts of blemishes that can lead to questions about an applicant's good moral character. Unlike the applicants in *Manville II, supra,* who submitted extensive proof of rehabilitation and good character to the Committee, the principal evidence of good moral character that Mr. Demos has submitted consists of fourteen affidavits, eight of which are identical, each less than a page long, and perfunctory in nature.[11] The Committee questioned the authenticity of these eight affidavits because they are not sealed with jurats. Considering the entire record, the Committee on Admissions concluded that this applicant had not made the requisite showing of good moral character by a preponderance of the evidence.

For the reasons stated above, I would acquiesce in the unanimous view of our Committee on Admissions, and reject Demos' application for admission to the Bar of the District of Columbia.

Before ROGERS, Chief Judge, MACK,** NEWMAN, FERREN, BELSON, TERRY, STEADMAN, and SCHWELB, Associate Judges.

## ORDER

PER CURIAM.

It appearing that a majority of the judges of this court has voted, *sua sponte,* to rehear this case en banc, it is

ORDERED that the opinions filed this date are hereby vacated. It is

FURTHER ORDERED that the Clerk shall schedule this matter for argument before the court sitting en banc as soon as the calendar permits. Counsel are hereby directed to provide 10 copies of the briefs heretofore filed to the Clerk on or before June 9, 1989.

11. Four of the other six affidavits are from Demos himself, his father, a family friend, and Edwin L. Felter, a retired New Mexico Supreme Court Justice. The other two affidavits are from friends of Demos who were responsible for the inaccurate responses to the Supplemental Questionnaire and their statements are primarily directed toward explaining those events. Although Demos states that he has produced 100 affidavits, the fourteen discussed are the only affidavits before the Court on this record.

